UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RODNEY A. MACDONALD,

Plaintiff,

v.

GLOCK, INC., BUFFALO BORE
AMMUNITION, INC, GUNS AND GEAR,
LLC, CABELA'S, AND CABELA'S
WHOLESALE, INC.,

Defendants.

Civil Action No. 15-30209-MGM

MEMORANDUM AND ORDER REGARDING BUFFALO BORE AMUNITION, INC.,
CABELA'S, AND CABELA'S WHOLESALE, INC.'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 116)

December 18, 2018

MASTROIANNI, U.S.D.J.

At the end of a day of hunting, Plaintiff Rodney A. MacDonald fired his friend's pistol,

which exploded in his hand. Plaintiff brought this products liability case, seeking to recover from the

ammunition manufacturer (Buffalo Bore, Inc.), the retailer that sold the ammunition to Plaintiff's

friend (Cabela's), and the retailer's wholesale distributor (Cabela's Wholesale, Inc. or "CWI"). Those

three defendants (together, "Defendants") are the only defendants remaining in this case.[1] Together,

they moved for summary judgment, contending Plaintiff's expert has not opined about the cause of

the explosion. Plaintiff counters that there is a dispute of material fact about causation because his

---

[1] Plaintiff also brought claims against Glock, Inc. (the manufacturer of the pistol) and Guns and Gear, LLC (the retailer that sold the pistol to Plaintiff's friend). Glock moved for summary judgment on all counts against it, and Plaintiff did not oppose the motion. Consequently, the court granted Glock's motion and entered final judgment in its favor. Glock is no longer a defendant in this case. Neither is Guns and Gear. Plaintiff voluntarily dismissed Guns and Gear to preserve this court's diversity jurisdiction.

To avoid confusion, the court refers to Glock, Inc. as "Glock" and to the pistol at issue in this case as "the pistol," except when directly quoting expert reports that refer to the pistol as "the Glock."

expert and Glock's expert opined that there were design, manufacturing, and/or warning defects in the ammunition. The court agrees. Accordingly, and for the reasons set forth more fully below, the Defendants' motion for summary judgment will be denied.

## I.       LOCAL RULE 56.1

As a preliminary matter, the court addresses the issue of whether Defendants complied with Local Rule 56.1, which requires the submission of a statement of undisputed material facts ("SOF") accompanying both a motion for summary judgment and any opposition. Specifically, the Rule provides:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. **Failure to include such a statement constitutes grounds for denial of the motion.** . . . A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. Material facts of record set forth in the statement required to be served by the moving party **will be deemed for purposes of the motion to be admitted** by opposing parties unless controverted by the statement required to be served by opposing parties.

D. Mass. Local Rule 56.1 (emphases added).

Originally there were two summary judgment motions before the court: Glock's and Defendants' (Defendants filed one motion together). Glock submitted a Rule 56.1 statement of facts in support of its motion. (Glock's SOF (Dkt. No. 115).) Defendants did not submit their own 56.1 statement in support of their motion. Instead, their brief incorporated by reference paragraphs 1-22 of Glock's 56.1 statement. (Defendants' Br. (Dkt. No. 117) at 2.) Plaintiff opposed Defendants' summary judgment motion and filed a supporting 56.1 statement that both responded to paragraphs 1-22 of Glock's 56.1 statement and set forth additional facts. (Plaintiff's SOF (Dkt. No. 127).) In footnote 1 of Plaintiff's 56.1 statement, he objected to Defendants' failure to file their own 56.1

statement and their purported incorporation of Glock's 56.1 statement. Plaintiff contended this is procedurally improper and grounds for denying Defendants' motion. Defendants filed a reply brief but did not respond to Plaintiff's 56.1 statement or to the argument that incorporating Glock's 56.1 statement was improper. (Defendants' Reply (Dkt. No. 133).)

The court held a hearing on Defendants' summary judgment motion on September 19, 2018. At the end of the hearing, Plaintiff's counsel raised the issue of the 56.1 statement and argued Defendants' motion should be denied for failure to submit their own statement. Defendants' counsel was caught off guard, apparently unaware that Plaintiff had raised this argument in his 56.1 statement. Nevertheless, Defendants' counsel argued that incorporating Glock's 56.1 statement was acceptable. The court ordered additional briefing on the issue. The parties timely filed their submissions. (Dkt. Nos. 138 & 140.)

In their supplemental brief, Defendants argued their incorporation of Glock's 56.1 statement satisfied the purpose of Rule 56.1, and, to the extent Defendants did not comply with the Rule, their non-conformance was hyper-technical and non-prejudicial. Plaintiff's supplemental brief focused on the substance of Glock's 56.1 statement that Defendants purported to incorporate. According to Plaintiff, Defendants are not entitled to summary judgment based on Glock's statement of facts because the facts on which Glock relied do not support a conclusion of no evidence of ammunition defects causing the explosion.

Both parties are correct. Local Rule 56.1 does not prohibit one party from incorporating by reference another party's 56.1 statement. The court has not found any case prohibiting that practice and instead located cases allowing it. *See, e.g., Saffold v. Village of Schaumburg*, No. 08-CV-5032, 2010 WL 1752584, at *2 n.4 (N.D. Ill. Apr. 30, 2010) (group of defendants filed a 56.1 statement and in it incorporated by reference another group of defendants' 56.1 statement); *Dabilis v. Hillsborough Cnty.*, No. 14-CV-371-JD, 2017 WL 1101070, at *1 (D.N.H. Mar. 23, 2017) (defendant county did not

submit a statement of facts but instead incorporated by reference statement submitted by individual defendants; court described county's submission as "non-conforming" but accepted it because plaintiff did not object or file his own factual statement).[2] Furthermore, Plaintiff was not prejudiced by Defendants' reliance on Glock's statement, and Plaintiff was able to respond to Glock's statement in his opposition to Defendants' summary judgment motion. But Plaintiff is right that Glock's statement does not contain any facts supporting the conclusion that Buffalo Bore ammunition did not cause the explosion. Glock's statement sets forth uncontested facts about Plaintiff's friend purchasing the pistol and ammunition, the hunting trip and target shooting, the explosion, and Plaintiff's expert's opinions (or lack of opinions) about causation with respect to the pistol. Glock's statement does not address any potential defect with the ammunition.

The court will accept Defendants' incorporation by reference of Glock's 56.1 statement. The court cautions, however, that the prudent practice going forward is for each movant to submit its own 56.1 statement.

## II.       FACTUAL BACKGOUND

The following is based on the undisputed facts contained in paragraphs 1-22 of Glock's 56.1 statement, Plaintiff's 56.1 statement submitted in opposition to Defendants' motion, and the exhibits supporting the 56.1 statements.

---

[2] The Northern District of Illinois and the District of New Hampshire both have Local Rules 56.1 similar to the District of Massachusetts'.

The Northern District of Illinois' provides: A party moving for summary judgment shall submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law"; that statement "shall consist of short numbered paragraphs" with "specific references" to "supporting materials." N.D. Ill. Local Rule 56.1(a). It imposes similar requirements on parties opposing summary judgment. *See id.* at 56.1(b).

The District of New Hampshire's provides: "A memorandum in support of a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried." D.N.H. Local Rule 56.1(a). It imposes similar requirements on parties opposing summary judgment. *See id.* at 56.1(b).

### A.      History of the Pistol and Ammunition

The pistol was originally sold before October 21, 1998. (Glock SOF (Dkt. No. 115) at ¶ 1.)

In July 2012, the pistol's then-owner pawned the pistol to Pawn America Minnesota, LLC. (*Id.* at

¶ 2.) Pawn America sold the pistol to Guns and Gear in October 2011. (*Id.* at ¶ 3.)

Eric Ainsworth bought the pistol from Guns and Gear in March 2012. (*Id.* at ¶ 4.) He dealt

with a man and a woman at Guns and Gear, whom he believes own the store, when he put the

pistol on layaway as he applied for his license to carry. (Ainsworth Depo. Tr. (Dkt. No. 115-3) at

33.) Ainsworth testified that when he picked up the pistol from Guns and Gear, he asked what type

of ammunition he should buy, and the owners asked him how he planned to use the pistol. (*Id.* at

33-34.) He responded that he would "carry [it] in the woods possibly using it for bigger game if [he]

had to." (*Id.*) The owners recommended Buffalo Bore ammunition. (*Id.* at 34.)

The day after Ainsworth picked up the pistol, he bought a fifty-round box of an unknown

brand of 10mm target ammunition. (Glock SOF (Dkt. No. 115) at ¶ 7.) He fired all fifty rounds. (*Id.*

at ¶ 8.) He later purchased Buffalo Bore ammunition, "heavy cast for bigger game." (Ainsworth

Depo. Tr. (Dkt. No. 115-3) at 36.) Specifically, he purchased Buffalo Bore's Heavy 10mm, Item

21C/20 220 gr. Hard Cast (1200 FPS/M.E. 703 ft lbs) ammunition from a Cabela's store in East

Hartford, Connecticut. (Glock SOF (Dkt. No. 115) at ¶ 9.) A few days before December 2, 2012,

Ainsworth went to a shooting range and fired some of the rounds of the Buffalo Bore ammunition

without incident. (*Id.* at ¶ 10.[3])

There may be some dispute about how the pistol was used or maintained before Ainsworth

bought it. (*Id.* at ¶ 6; Plaintiff Opp. to Glock SOF (Dkt. No. 127) at ¶ 6.) Defendants contend

---

[3] Paragraphs 8 and 10 of Glock 56.1 Statement are undisputed. They discuss Ainsworth firing the first fifty
rounds of ammunition that he purchased and him firing some of the rounds of the Buffalo Bore ammunition,
respectively. Neither paragraph states Ainsworth used the pistol at issue in this case when firing those rounds,
but, for purposes of this motion, the court assumes he did use that pistol.

"[t]here is no information on how the Subject Pistol was used or maintained between when Glock

sold it sometime prior to October 21, 1998, and when Guns & Gear acquired it on or about

October 1, 2011 . . . " (Glock SOF (Dkt. No. 115) at ¶ 6.) Plaintiff objected to this assertion,

claiming his expert opined "there was no evidence o[f] improper maintenance of the subject pistol,"

and Glock's expert opined "the subject pistol is in good condition with the exception of the damage

. . . which occurred at the time of the incident . . . and [the pistol] shows reasonable care and

moderate use." (Plaintiff Opp. to Glock SOF (Dkt. No. 127) at ¶ 6.)

    **B.**    **The Accident**

    On or about December 2, 2012, Plaintiff, Ainsworth, and several other people went hunting

in Chester, Massachusetts. (Glock SOF (Dkt. No. 115) at ¶ 11.) After hunting, some members of the

group, including Plaintiff and Ainsworth, engaged in target shooting with pistols. (*Id.* at ¶ 12;

Ainsworth Depo. Tr. (Dkt. No. 115-3) at 58-60.)

    Ainsworth took the pistol out of a safe in his truck. (Ainsworth Depo. Tr. (Dkt. No. 115-3)

at 58.) He loaded it with the remaining rounds of the Buffalo Bore ammunition he had left over

from when he had gone to the range a few days earlier. (Glock SOF (Dkt. No. 115) at ¶¶ 9-10, 13.)

    Plaintiff then fired the pistol, and it exploded. (*Id.* at ¶ 14.) Ainsworth described that he saw

"a flash and pieces of the firearm went everywhere," and Plaintiff "had pieces of like the polymer

[from the pistol's slide] stuck in his forehead." (Ainsworth Depo. Tr. (Dkt. No. 115-3) at 64.)

Plaintiffs' "hand instantly swelled up and [there was] discoloration." (*Id.*) Plaintiff confirmed his

"hand was just black and blue." (Plaintiff Depo. Tr. (Dkt. No. 115-8) at 147.) He also testified that

"a big hole [had been] blown out of the cartridge." (*Id.* at 145.) After the explosion, Ainsworth took

the pistol and secured it in his safe. (Glock SOF (Dkt. No. 115) at ¶ 15.)

### C.     The Parties' Expert Reports

Plaintiff, Defendants, and Glock all hired experts to opine on liability. Plaintiff hired Greg

Danas,[4] Defendants hired Frederick Schmidt, and Glock hired James Hutton. Each expert submitted

a report, but none has been deposed. The experts reviewed the pistol and ammunition as follows

(Danas Rpt. (Dkt. Nos. 115-11 & 125-1[5]) at 3); Hutton Rpt. (Dkt. No. 125-2) at 4, 6):

- January 6, 2017: Initial evaluation and two-dimensional x-ray analysis of the pistol. A fractured casing was contained in the pistol's chamber, and rounds of live ammunition remained in the pistol. Danas was present, but Hutton and Schmidt were not.

- March 31, 2017: Examination of the pistol without destructive testing. The pistol and ammunition were photographed. The ammunition was weighed on two scales. Danas, Hutton, and Schmidt were all present.

- October 18, 2017: Three-dimensional CT scan, micro and macro photography, destructive testing of the pistol (during which its component parts and the casing that remained in the chamber were removed), and photography of the pistol's component parts. Danas, Hutton, and Schmidt were all present.

The court does not adopt any of the experts' conclusions but summarizes the three expert

reports below.

### 1.     Danas Report (Plaintiff's Expert)

Plaintiff's expert, Danas, examined the pistol and the remaining rounds of Buffalo Bore

ammunition. (Danas Rpt. (Dkt. Nos. 115-11 & 125-1) at 2-3.) His report explains that certain factors

limited his ability to assess the pistol and ammunition. First, the pistol's frame and component parts

were "destroyed and cannot be tested or evaluated via mechanical operation." (*Id.* at 2.) As a result,

---

[4] Plaintiff may have hired a second expert, Richard Bertaska, but any opinions he may have offered were not submitted with the summary judgment record. (Hutton Rpt. (Dkt. No. 125-2) at 1 (referencing the curriculum vitae of "Plaintiff's Expert Mr. Richard Bertaska").)

[5] Glock submitted Danas' report as an exhibit to its Local Rule 56.1 statement. (Dkt. No. 115-11.) The version Glock filed does not contain supporting documents attached to the Report on which Danas relied. Plaintiff submitted Danas' report—with those supporting documents—in opposition to Defendants' summary judgment motion. (Dkt. No. 125-1.)

he was "prohibited from offering an objective analysis as to the physical condition of the subject pistol frame and its internal component parts prior to its catastrophic failure." (*Id.*) Second, the discharged cartridges Plaintiff fired from the pistol cannot be located. (*Id.*) Danas explained: "the physical properties of the discharged casing may have assisted in determining the cause of the single cartridge case failure." (*Id.*) But "[w]ithout this material evidence, additional scientific / exploratory testing cannot be performed." (*Id.*)

Despite these challenges, Danas offered several opinions about the pistol and the Buffalo Bore ammunition. In sum, he did not identify any defect with the pistol but did identify potential design, manufacturing, and/or warning defects with the ammunition. But he could not determine the explosion's "root cause." (*Id.* at 7.)

### i.  The Pistol

Danas opined the dimensions of the pistol's barrel were within factory specifications (but he did not identify what those specifications are or how the barrel compared). (*Id.* at 4.) He did not find any evidence that Glock's barrel allowed for an unsupported cartridge in the chamber, so long as properly-sized cartridges were used. (*Id.*) He also did not find any visual evidence of dirt or heavy oil contaminants in the chamber. (*Id.*) There were ordinary tool marks on the firing pin aperture, which "suggest[ed] the casing was positioned properly in the chamber with an acceptable variation in location of the firing pin / firing pin aperture impressions." (*Id.*) Finally, Danas opined that had the pistol not been properly maintained or had the chamber dimensions been out of specification, the pistol "would have likely experienced an earlier failure." (*Id.*)

### ii.  The Failed Casing

Danas determined the failed casing remaining in the pistol had "ruptured at a location consistent with over pressurization of the cartridge & barrel," and the casing was "fully seated and

supported by the chamber at the time of discharge." (*Id.*) In addition, the length of the casing was consistent with a casing that had experienced over-pressurization. (*Id.*)

### iii.        The Remaining Live Rounds of Ammunition

Danas reviewed the seven live 10mm cartridges that remained in the pistol. (*Id.* at 5.) He identified two potential issues with them. (*Id.* at 5-7.) First, the cartridges contained hard cast projectiles weighing 220 grains, which were heavier than most other commercially-manufactured 10mm ammunition and denser than traditional lead bullets. Second, there was a discrepancy in the weights of two of the remaining cartridges in comparison to the other five. The court summarizes each in turn.

As to the projectiles, Danas explained the Buffalo Bore ammunition contained 220-grian weight projectiles, and most other commercially-manufactured 10mm ammunition contains projectiles weighing 180 or 200 grains. (*Id.* at 6.) These hard cast projectiles "are extremely dense by comparison to traditional lead bullets." (*Id.* at 5.) Danas noted, "[t]heoretically, hard cast bullets do not 'form fit' or 'easily pass through' barrels . . . as compared to ammunition manufactured with softer, swage lead." (*Id.*) And, "[t]heoretically, the longer (in time) it takes for a heavy - extra hard projectile to form fit, traverse and exit the muzzle of a handgun, the more likely there will be a dramatic rise in barrel / chamber pressure." (*Id.* (emphasis omitted).) "Extreme energy created by firing a 220 grain projectile propelled via maximum / compressed powder charges within a 10mm cartridge case will expose any semi-automatic handgun to potential catastrophic failure." (*Id.* at 6.) A delay in the projectile leaving the pistol's barrel, "due to a heavier projectile combined with the heaviest powder charge (as marketed by Buffalo Bore ammunition) will often contribute to an over pressurization of the barrel via a slower moving projectile." (*Id.* (emphases omitted).) Danas contended Buffalo Bore used heavier projectiles to purposefully create "deeper penetration" by "achiev[ing] greater velocity and . . . transfer[ring] greater energy to the target." (*Id.* at 5-6.)

Danas opined, "[i]t is evident that BB ammunition may have an adverse effect on a pistol from which it is discharged" and "not all Buffalo Bore ammunition can be fired safely through traditional firearms due to such express 'hi pressures.'" (*Id.* at 5 (emphases omitted).) But he did not opine whether the Buffalo Bore ammunition at issue here could be safely fired from the pistol.

In addition, Danas reviewed a label on Buffalo Bore's .45 Colt +P ammunition (a type of ammunition that is not at issue in this case). (*Id.*) The label warns that "All Heavy .45 Colt +P ammunition is to be fired ONLY in" certain, specified firearms and is "NOT for use in small frame Ruger vaquero." (*Id.*) Danas claimed this label shows that Buffalo Bore was concerned about liability for the "potential of catastrophic failure when their ammunition is fired." (*Id.* at 6 (emphasis omitted).) Danas did not explain whether the ammunition at issue here contained any warnings and did not suggest what warnings Buffalo Bore should have provided.

Second, as to the discrepancy in the weight of the remaining live rounds, Danas noted only that "[a]nalysis of the total grain weight of the seven (7) live 10mm cartridges reveal[s] an unusual variation of seven (7) grains of powder amongst seven (7) live Buffalo Bore 10mm cartridges." (*Id.* at 6-7.) Danas does not know the source of the variation: it "may be a variable of the bullet, powder or both." (*Id.* at 7.) Danas did not explain if or how the source of the variation may have caused or impacted the explosion. Glock's expert, Hutton, provided a deeper analysis of the variation in the weights of the rounds. Hutton's analysis is described below.

###### iv.    Causation

Throughout Danas' report, he conceded he cannot determine the explosion's exact cause:

- "The excessive pressure created by the Buffalo Bore 10mm ammunition fractured the Glock pistol frame **contributing to** the destruction of the subject firearm." (*Id.* at 1 (emphasis added).)

- Danas purportedly identified "various conditions" present in the pistol that "**may** contribute / occur as a result of catastrophic failure / an explosive event." (*Id.* at 4 (emphasis added).) Those conditions relate to over pressurization, which "can

10

physically blow the magazine out of the pistol, destroy the locking block and the internal component parts of the pistol frame." (*Id.*) In addition, the trigger bar can bend, the barrel can rupture, and the frame can crack. (*Id.*) Danas claimed that "[i]t is evident that all of these conditions exist in the subject Glock." (*Id.*) In the next sentence, though, he backtracked, stating that "[i]nstances of firing 'out of battery' will also cause such effects." (*Id.*) And later in his report, he explained that he "**cannot rule out the likelihood of an 'out of battery' discharge** of the Glock pistol due to the destructive nature of the handgun frame." (*Id.* at 6 (emphasis added).)

- "Analysis of the total grain weight of the seven (7) live 10mm cartridges reveal[s] an unusual variation of seven (7) grains of powder amongst seven (7) live Buffalo Bore 10mm cartridges. **Such variation may be a variable of the bullet, powder or both**." (*Id.* at 6-7 (emphasis added).)

- "A good faith effort has been maid [sic] to identify specific / obvious reasons for the failure of the ammunition and pistol in this case. **Extensive additional analysis would be required to [possibly] determine the root cause of this failure**." (*Id.* at 7 (emphasis added) (brackets in original).)

## 2.    Schmidt Report (Defendants' Expert)

Defendants' expert, Schmidt, submitted a brief response to Danas' report. (Schmidt Rpt. (Dkt. No. 115-12).) Schmidt attended joint expert examinations of the pistol and the ammunition, and he reviewed various "reports, photographs and protocols." (*Id.* at 3.) Based on his review and analyses, he did not find evidence "of any significant indication" that the "Buffalo Bore ammunition was deficient with respect to causation of the firearm failure." (*Id.*) Schmidt went on to critique Danas' report as not offering a conclusive opinion about causation and as being speculative and conclusory. (*Id.*) Schmidt notes that Danas did not identify any standards on which he relied. (*Id.* at 4.) And Danas' conclusion that the cartridge was over-pressurized is, according to Schmidt, unsupported. (*Id.*) In terms of the variation in the weights of the remaining live rounds, Schmidt argues that Danas did not explain why the difference might be significant. (*Id.*)

Schmidt did not offer any opinion about whether the pistol was defective.

### 3.    Hutton Report (Glock's Expert)

Glock's expert, Hutton, participated in the examinations on March 31 and October 18, 2017. (Hutton Rpt. (Dkt. No. 125-2) at 4, 6.) His report describes his observations from the examinations, describes the design of the pistol, assesses the Buffalo Bore ammunition, briefly explains the incident where the pistol exploded, and concludes with a series of opinions.

### i.    March 31st Examination

Hutton considered the pistol to be "in good condition with the exception of the damage to the polymer frame and internal parts which occurred at the time of the incident." (*Id.* at 5.) The pistol's exterior showed "reasonable care and moderate use." (*Id.*) The "bottom rear" of the cartridge was "ruptured and 'blown-out' downward from high pressure gases present at the time of firing." (*Id.*) Hutton explained the impact of the high-pressure gases:

> These gases acted to blow the magazine downward and out of the pistol, which caused the breakage and loss of the magazine catch. The gases also acted to inflate the interior of the frame just below the chamber which caused the sidewalls of the frame to fracture and blow out laterally. The interior metal parts, such as the slide stop lever, were bent downward and outward by the escaping gases also.
>
> This damage is consistent with being caused by a fracture failure of the lower rear of the cartridge body, in an area located above the feed ramp of the barrel. . . .

(*Id.*)

The remaining seven live rounds of ammunition "[a]ll appeared to be new." (*Id.*) Five "were fairly consistent in weight," but two each weighed roughly 5.6 grains less than the other five. (*Id.* at 5-6.) Hutton explained that without disassembling the cartridges and weighing each component separately (which apparently was not done), "it cannot be known which component—the empty case, bullet, powder, or primer—or a combination thereof—caused the low weights."[6] (*Id.* at 5.) He

---

[6] This is consistent with Danas' report, in which he stated that the variation in weight "may be a variable of the bullet, powder, or both." (Danas Rpt. (Dkt. Nos. 115-11 & 125-1) at 7.)

continued: "Depending on which component(s) contributed to this cartridge weight difference, the affect [sic] on the performance of any one cartridge could be minimal or very significant: if the weight difference is shown to be in the cartridge case or the bullet, the affect [sic] would be minimal." (*Id.* at 6.) But "if there was [sic] 5½ grains of difference in the weights of the propellant powders, then the performance of the cartridge would be drastically affected." (*Id.*) Because of the differences in weights, Hutton found "the degree of quality control to be poor." (*Id.*)

### ii.        October 18th Examination

The experts used three-dimensional x-ray tomography (a CT scan) to examine the condition of the pistol's interior components. (*Id.*) According to Hutton, the imaging did not show any "indications that any part of the [Glock] failed, or contributed in any way to cause the failure of the cartridge case body to properly contain the high pressure gases at the time of the incident." (*Id.*) Likewise, when the pistol was disassembled and Hutton examined its component parts, he did not observe any conditions that "would cause or contribute to cause, [sic] the case body of the incident cartridge to fail or 'blow out' in the manner that it did." (*Id.* at 7.)

Hutton found the damage to the exploded cartridge case was "consistent with a 'very excessive' pressure event."[7] (*Id.*) But the edges of the hole in the case had certain irregular features that appeared "to be evidence of variations in the locally demonstrated strength, or the grain structure, of the brass metal of the subject cartridge." (*Id.*) He concluded the cartridge case failed due to "the presence of 'very excessive' chamber pressure, which was well in excess of proof

_____

[7] "Very excessive pressure" is a term of art. (Hutton Rpt. (Dkt. 125-2) at 7-8.) Normal maximum chamber pressure for a 10mm cartridge is "about 35,000 psi." (*Id.* at 7.) "Excessive pressure" refers to "any chamber pressure above 35,000 psi and below the minimum average proof pressure of 50,000 psi." (*Id.* at 7-8.) "Very excessive pressure" refers to chamber pressure above proof pressure. (*Id.* at 8.)

pressure for the 10 mm auto cartridge." (*Id.*) In addition, an indentation on the head of the exploded cartridge case indicated that there was no out-of-battery firing at the time of the explosion.[8] (*Id.* at 8.)

### iii.       Design of the Ammunition

Hutton reviewed Buffalo Bore's website and took issue with comments posted by the company's owner about the 220-grain ammunition. (*Id.* at 9.) First, Buffalo Bore's owner posted that 220-grain ammunition is "the absolute heaviest bullet that can be fired through 10mm pistols." (*Id.*) Hutton responded that Glock pressure-tested Buffalo Bore 220-grain ammunition with a 10mm automatic pistol and found that the average pressure was 123% of the maximum average pressure according to standards set by SAAMI, an organization that creates and publishes firearm industry standards for safety, interchangeability, reliability, and quality. (*Id.*) *See* About SAAMI, https://saami.org/about-saami/ (last visited Dec. 17, 2018). Further, SAAMI recommends that a 200-grain (rather than 220-grain) bullet is the heaviest that should be used with a 10mm automatic cartridge. (Hutton Rpt. (Dkt. No. 125-2) at 9.) Based on his training and expertise, Hutton understands that, "[a]ll else being equal, a heavier bullet will always cause a higher peak bore pressure." (*Id.*)

Second, the owner also posted that

> [t]hese loads bring out the full potential of the 10 mm, but operate at standard pressures and as such, are safe to use in any standard 10mm pistol. . . . When the cartridge fires, it generates enough pressure/recoil to prematurely open your breech face in some guns.
>
> The new Glock Model 20 comes with a recoil spring that allows the breech face to open too soon [with the 220 gr. bullet] and my new Glock model 20 will get extreme spreads of about 100 fps with the factory spring installed. When I go to a stiffer recoil spring, the extreme spreads drop to about 50 fps in my new Glock 20. If you want the full powered 10mm ammo we make, you simply need to tweak your pistol.

---

[8] Danas, on the other hand, could not rule out an out-of-battery firing. (Danas Rpt. (Dkt. Nos. 115-11 & 125-1) at 6.)

(*Id.* at 9 (brackets in original) (emphasis omitted).) Hutton explained that in this post, the owner says the Glock model 20 (which is the type of pistol at issue in this case) should be modified with a stiffer after-market recoil spring so that the gun does not "prematurely open" when the 220-grain ammunition is fired. (*Id.*)

### iv.        Hutton's Concluding Opinions

Hutton's report concludes with seven opinions, six of which are relevant here:

First, the ammunition "was defective in design because it used a 220 grain bullet which is heavier than the maximum 200 grain bullet that is recommended by SAAMI . . . standards for safe ammunition." (*Id.* at 10.)

Second, the ammunition "was defective in its manufacture because the incident cartridge case ruptured at the time it fired, primarily due to a single cartridge that produced a 'very excessive chamber pressure.'" (*Id.*) The excessive pressure was caused by "1) simply too much propellant powder and/or 2) the use of the too-heavy 220 grain bullet." (*Id.*) There were defects in the brass cartridge case body that "lowered its strength" and contributed to the failure. (*Id.*)

Third, Ainsworth having fired at least 50 rounds of normal ammunition and ten rounds of the Buffalo Bore ammunition all without incident "prove[]" the pistol "was a safe design, and one without defect in manufacture." (*Id.* at 11.)

Fourth, that the pistol had successfully fired normal ammunition and the Buffalo Bore ammunition is "very strong evidence" that there was a defect in the round that exploded. (*Id.*)

Fifth, the pistol did not have a design defect that caused the failure. (*Id.*)

Sixth, the pistol did not have a manufacturing defect that caused or contributed to the failure. (*Id.*)

### III.        RELIANCE ON AN OPPOSING PARTY'S EXPERT OPINION

Plaintiff—who declined to oppose Glock's summary judgment motion—repeatedly cited Glock's expert report in his 56.1 statement and attached the report to his brief. At the summary judgment hearing, Plaintiff's counsel represented that he believes his own expert's (Danas) opinions are sufficient to clear the summary judgment hurdle, but he may call Glock's expert (Hutton) at trial, even though Glock has been dismissed from the case.

Defendants argue that Plaintiff cannot rely on Hutton's opinions to survive summary judgment because, Defendants contend, his opinions will not be admissible at trial as Glock is no longer a party. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Defendants also argue that Plaintiff cannot rely on Hutton's opinions because he has not disclosed Hutton under Fed. R. Civ. P. 26 or the various scheduling orders in this case. Defendants claim—but do not articulate how—they will be prejudiced if Plaintiff is permitted to rely on Hutton's opinions. Finally, Defendants argue Plaintiff cannot call Hutton at trial because calling an opposing party's expert is not ordinarily done. These arguments are unpersuasive, and Defendants have not established that Hutton's opinions are inadmissible.

As an initial matter, the only issue before the court is whether Plaintiff may rely on the opinions of an expert retained by a defendant that has since been dismissed from the case to defeat a remaining defendant's summary judgment motion. The court has not found any precedent prohibiting Plaintiff from relying on Hutton's opinions. *See, e.g., Gaudette v. Saint-Goabin Performance Plastics Corp.*, No. 1:11-cv-932 (MAD/RFT), 2014 WL 1311530, at *10 (N.D.N.Y. Mar. 28, 2014) ("The Court is not aware of any precedent which would bar Plaintiff from relying on [one defendant's expert's] opinions to defeat [a second defendant's] motion for summary judgment."). Like the court in *Gaudette*—for the reasons explained below—this court "is persuaded by the

reasoning of . . . courts that have considered this issue in the analogous context of reliance upon another party's expert reports and deposition testimony at trial and concluded that such reliance is permissible" for the purposes of summary judgment. *Id.*

Defendants may be right that parties do not generally call adversaries' experts to testify in their cases-in-chief. But the court has not found—and Defendants have not identified—any rule prohibiting it. *See, e.g.*, *Kerns v. Pro-Foam of S. Ala.*, 572 F. Supp. 2d 1303, 1309 (S.D. Ala. 2007) ("Neither the parties' briefs nor the Court's own research reveals any *per se* rule forbidding a party from calling an adversary's expert during his case-in-chief."). Indeed, there are cases where parties have opted to call adverse experts, and those courts have rejected the arguments Defendants make here. *See id.* (citing cases).

First, that Glock was dismissed as a defendant has no bearing on whether Plaintiff can call Hutton in its case-in-chief. *See generally* Lori J. Henkel, Compelling Testimony of Opponent's Expert in State Court, 66 A.L.R. 4th 213 § 2(a) (1988) ("A substantial number of courts have expressed the view that one party may compel the testimony of an expert initially retained by the opposing litigant."). As the Eleventh Circuit has explained, "[o]nce a witness has been designated as expected to testify at trial, there may be situations when the witness should be permitted to testify for the opposing party." *Peterson v. Willie*, 81 F.3d 1033, 1037-38 (11th Cir. 1996). Other courts have agreed. *See House v. Combined Ins. Co. of Am.,* 168 F.R.D. 236, 245 (N.D. Iowa 1996) ("[O]nce an expert is designated, the expert is recognized as presenting part of the common body of discoverable, and generally admissible, information and testimony available to all parties."); *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C. 1983) ("[N]o party to litigation has anything resembling a proprietary right to any witness's evidence. Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance.").

Whether to permit a party to call an adverse party's expert is within the trial court's discretion. *See Nat'l R.R. Passenger Corp. v. Certain Temporary Easements Above the R.R. Right of Way in Providence, R.I.,* 357 F.3d 36, 42 (1st Cir. 2004) (district court did not abuse its discretion in allowing party to call opponent's expert during party's case-in-chief and to examine him as hostile witness). Courts have allowed a party to rely on another party's expert even when the party that originally retained the expert is no longer involved in the case. *See DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach,* 576 F.3d 820, 826-27 (8th Cir. 2009) ("DG&G also objects that the expert reports should not have been considered because Anthony was a retained expert for a settling party, never produced for deposition. DG&G cites no authority prohibiting the use of another party's expert report for summary judgment purposes. The record demonstrates that DG&G had an opportunity to depose Anthony when the settling party identified him as a retained expert, and when FlexSol identified him as a non-retained expert."); *Nichols v. Am. Risk Mgmt.,* No. 89 Civ. 2999 (JSM) (AJP), 2000 WL 97282, at *1-*3 (S.D.N.Y. Jan. 28, 2000) (allowing plaintiff to offer at trial "the deposition testimony of another party's expert (here, that of a defendant who has since settled out) against a remaining adverse party . . . [under Fed. R. Civ. P. 32(a)(3)(B)] where the expert lives and works over 100 miles from the courthouse").

Second, this is not a situation that Rule 26's disclosure requirements were designed to prevent. A key purpose of expert disclosures is to minimize surprise. *See Thibeault v. Square D Co.,* 960 F.2d 239, 244 (1st Cir. 1992). In line with that purpose, disclosures are "consonant with the federal courts' desire to 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent.'" *Id.* (quoting *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682 (1958)). But here, Defendants' have long known of Hutton's identity, have had access to Hutton's report for as long as Plaintiff has, should be familiar with his opinions directly implicating Defendants' liability, and—until Plaintiff chose to not oppose Glock's summary

18

judgment motion—Defendants would have prepared to defend against Glock blaming the explosion on the ammunition. As a result, "[t]he risk of unfair surprise to [Defendants] here is exactly nil." *Kerns*, 572 F. Supp. 2d at 1310.

Third, Defendants claim they will be "severely prejudiced" by Plaintiff's reliance on Hutton. But Defendants have not articulated any specific prejudice they may face. *See id.* at 1310 ("[D]efendant invokes the buzzwords of 'undue prejudice' and states that plaintiffs calling [defendant's expert] in these circumstances would have the effect of 'confusing the jury,' but never explains how or offers any specifics to justify application of those catchphrases here."). Defendants have Hutton's report and—had Glock not been dismissed from the case—would have had to formulate a strategy to defend Glock's argument that defective ammunition caused Plaintiff's injuries. Plaintiff, of course, has always taken the position that defects in the ammunition caused his injuries. This is not a case where a party disclosed a new expert or new opinion on the eve of trial.

The court doubts whether Danas' opinions alone can sustain Plaintiff's burden of proof in this case. At this stage, though, Danas' opinions read in conjunction with Hutton's and in contention with Schmidt's create a factual dispute as to whether a defect in the Buffalo Bore ammunition caused the explosion. As explained above, there is no rule prohibiting Plaintiff from calling Hutton as a witness at trial. The practical concerns of whether Hutton will testify voluntarily or whether he is outside of the subpoena power are issues to be resolved closer to trial. In the event Hutton does not testify at trial, Defendants can raise the issue of whether Plaintiff has met his burden of proof in a motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a).

## IV.        SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting a fact cannot be genuinely disputed, the movant must support that contention

by "citing to particular parts of materials in the record" or "showing that . . . an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1). A party may object to material that is cited as either supporting or disputing a fact on the ground that it "cannot be presented in a form that would be admissible in evidence." *Id.* at 56(c)(2).

The court must view the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993).

> When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.

*Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## V.      THE CAUSES OF ACTION

Plaintiff brought five products liability-related counts[9]: negligence and breach of the implied warranty of merchantability against Buffalo Bore (Counts I and II, respectively); and negligence, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for

---

[9] In their motion papers, the parties relied on Massachusetts law but did not discuss choice of law. This is a diversity action, so state substantive law applies. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). To determine which state's substantive law applies, the court follows Massachusetts' choice-of-law rules. *See In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 14 (1st Cir. 2012). Massachusetts courts follow the Restatement (Second) of Conflict of Laws, which provides that, in tort cases, the laws of the state with "the most significant relationship to the occurrence and the parties" applies. Restatement (Second) of Conflict of Laws § 145(1) (1971). In assessing that relationship, courts consider, among other things, "the place where the injury occurred." *Id.* at § 145(2)(a); *see also Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 333 (1983) ("The law of Massachusetts is that ordinarily 'the substantive law governing an action of tort for physical injury is that of the place where the injury occurred.'") (quoting *Brogie v. Vogel*, 348 Mass. 619, 621 (1965)). Here, Plaintiff's injury occurred in Massachusetts, the pistol was sold in Massachusetts, and Plaintiff lives in Massachusetts. Even though Cabela's sold the Buffalo Bore ammunition in Connecticut, that state has no other connection to this case. And no other state has a relationship more significant than Massachusetts' to the parties or the incident. Accordingly, the court will apply Massachusetts law.

a particular purpose against Cabela's and CWI[10] (Counts III, IV, and V, respectively).[11] The claims against all Defendants are based on two theories: (1) defective design, development, testing, manufacture, assembly, marketing, sale, and/or distribution and (2) failure to warn. While the individual counts are legally distinct causes of action, they do overlap, especially because they are based on the same theories. *See Wasylow v. Glock, Inc.*, 975 F. Supp. 370, 376 (D. Mass. 1996) ("Analytically, these causes of action [(negligence, breach of warranty, and c. 93A)] are distinct yet overlap, and consequently are often confused by the parties as well as in caselaw.").

The negligence counts (Counts I and III) focus on Defendants' conduct. *See Colter v. Barber-Greene Co.*, 403 Mass. 50, 61 (1988). "Negligence, in general, requires a duty, breach of duty, cause-in-fact (or 'but-for-cause'), and proximate cause (or 'legal cause')." *Wasylow*, 975 F. Supp. at 376. The question is whether the "manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." *Colter*, 403 Mass. at 61.

---

[10] Defendants are represented by the same attorneys and filed this summary judgment motion together. There has been no advocacy urging dismissal of Cabela's or CWI. This may be because, under Massachusetts law, a "seller of a product," like a manufacturer, "has a duty to warn customers or expected users of the product of latent defects or dangers in its normal and intended use." *Rose v. The Sports Auth.*, No. 99-2620, 2002 WL 1592523, at *2 (Mass. Super. Ct. July 10, 2002). Similarly, a retailer is strictly liable for breach of warranty based on defects in products it sells. *See* G.L. c. 106, §§ 2-314, 2-315; *see also Mitchell v. Stop & Shop Cos.*, 41 Mass. App. Ct. 521, 523 (1996) ("[M]odern products liability law, which not only makes a manufacturer strictly liable, generally, for injuries caused by defects in its product, . . . extends strict liability as well to the distributor or retailer of the manufacturer's product.") (internal citations omitted). A "retailer or distributor who has acted merely as a conduit for the product and has not altered it or otherwise acted in a manner that contributed to the injuries may then normally sue the manufacturer of the defective product for indemnification." *Mitchell*, 41 Mass. App. Ct. at 523.

The court is unaware of whether Buffalo Bore has agreed to indemnify Cabela's and CWI. The court seeks to ensure Cabela's and CWI's interests are being represented. Thus, defense counsel is ordered to file a report with the court by January 3, 2019 confirming counsel conferred with Cabela's and CWI and whether they consent to joint representation with Buffalo Bore.

[11] In addition, Glock brought cross-claims against Defendants for contribution and indemnification. Defendants brought cross-claims against Glock for contribution. Because Glock has been dismissed from this case, all cross-claims have also been dismissed. (Dkt. No. 136.)

The breach of warranty counts (Counts II, IV, and V), on the other hand, focus on the product and are governed by statute. *See id.* at 61-62; G.L. c. 106, § 2-314 (merchantability); *id.* at § 2-315 (fitness for a particular purpose). Massachusetts courts interpret these warranty statutes as being "congruent in nearly all respects with the" strict liability principles in the Restatement (Second) of Torts § 402A (1965). *See Back v. Wickes Corp.*, 375 Mass. 633, 640 (1978); *Mitchell*, 41 Mass. App. Ct. at 523 (manufacturer, distributor, and retailer all, generally, strictly liable for product defects) (citing G.L. c. 106, §§ 2-314 & 2-315; other citations omitted). "Therefore, a breach of warranty can occur, regardless of negligence, if either 1) the product is defectively designed, or 2) foreseeable users are not adequately warned." *Wasylow*, 975 F. Supp. at 377.

Starting with the implied warranty of merchantability, goods must be "fit for the ordinary purposes for which such goods are used"; must "run . . . of even kind, quality and quantity with each unit and among all units involved"; and must "conform to the promises or affirmations of fact made on the container or label if any." G.L. c. 106, §§ 2-314(2)(c), (d), & (f).

The warranty of fitness for a particular purpose is narrower and applies to a seller who "at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." G.L. c. 106, § 2-315. Plaintiff must prove three elements: "(1) the seller had reason to know of the particular purpose for which the buyer requires the goods; (2) the seller had reason to know of the buyer's reliance on the seller's skill or judgment in selecting or furnishing suitable goods; and (3) the buyer's reliance in fact." *Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 34 (1987). "A 'particular purpose' differs from the 'ordinary purpose' in that it 'envisages a specific use by the buyer which is peculiar to the nature of his business.'" *Wasylow*, 975 F. Supp. at 377 (quoting comments to G.L. c. 106, § 2-315).

Here, with the help of Hutton's report, Plaintiff's negligence claims survive summary judgment. The breach of warranty claims are legally distinct from the negligence claims. But like the negligence claims, Plaintiff's success on the warranty claims requires proof of a design, manufacturing, or warning defect in the ammunition. As discussed above, there are factual disputes about whether the Buffalo Bore ammunition was defective. As a result, summary judgment is not appropriate for any claim.

## VI.      CONCLUSION

For the reasons set forth above, Buffalo Bore, Cabela's, and CWI's motion for summary judgment is DENIED. Defense counsel is ordered to file the report described in footnote 10 by January 3, 2019 confirming counsel conferred with Cabela's and CWI and whether they consent to joint representation with Buffalo Bore. The clerk is directed to schedule a conference to set a trial date.


It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge